PER CURIAM.
This case is before the Court on the petition of Rosalie Whiley for a writ of quo warranto seeking an order directing Respondent, the Honorable Rick Scott, Governor of the State of Florida, to demonstrate that he has not exceeded his authority, in part, by suspending rulemaking through Executive Order 11-01. We have jurisdiction. See art. V, § 8(b)(8), Fla. Const. In exercising our discretion to resolve this matter, we grant relief and specifically hold that the Governor impermis-sibly suspended agency rulemaking to the extent that Executive Orders 11-01 and 11-72 include a requirement that the Office of Fiscal Accountability and Regulatory Reform (OFARR) must first permit an agency to engage in the rulemaking which has been delegated by the Florida Legislature.[1] Absent an amendment to the Administrative Procedure Act itself or other delegation of such authority to the Governor’s Office by the Florida Legislature, the Governor has overstepped his constitutional authority and violated the separation of powers. Accordingly, upon this basis we grant the petition for writ of quo warranto.
BACKGROUND
On January 4, 2011, Governor Scott issued “Executive Order Number 11-01 (Suspending Rulemaking and Establishing the Office of Fiscal Accountability and Regulatory Reform),” which created that office (OFARR) within the Executive Office of the Governor.[2] OFARR is tasked *706 with the goal of ensuring that agency-created rules do not hinder government performance and that they are fiscally responsible. OFARR specifically looks for rules that affect businesses, public health/safety, job growth, and indirect costs to consumers. Under Executive Order 11-01, state agencies controlled by the Governor were directed to immediately “suspend ” rulemaking activities. State agencies not directly under the Governor’s control were requested to “suspend” rule-making activities. The executive order further provided that, before submitting a notice of proposed rulemaking or of amendments to existing rules pursuant to the rulemaking procedures mandated by Chapter 120, the agencies under the direction of the Governor were required to submit the complete text of the proposed rule or amendment to OFARR for review, along with any other documentation the office may require. The executive order directed each agency head to do the following: appoint an “Accountability and Regulatory Affairs Officer”; review and evaluate the agency’s current policies “relating to programs and operations administered or financed by the agency and make recommendations to improve performance and fiscal accountability”; submit to the Governor a comprehensive review of existing rules and regulations, together with recommendations as to whether any such rules should be modified or eliminated; and submit a “regulatory plan” which identifies and describes any rules the agency head expects to promulgate during the following twelve-month period. The Secretary of State was ordered not to publish any rulemaking notices in the Florida Administrative Weekly absent authorization from OFARR.
A superseding, second executive order, Executive Order 11-72, also pertaining to agency rulemaking, was issued by the Governor’s Office on April 8, 2011. The two executive orders are substantially the same; the primary differences are that the superseding order does not expressly use the terms “suspending” and “suspend,” and that the operation of OFARR is continued rather than established.[3]
On March 28, 2011, Whiley, in her capacity as a citizen and taxpayer, filed a petition for a writ of quo warranto naming Governor Scott as the respondent. The petition challenges the authority of the Governor to issue Executive Order 11-01 as a violation of separation of powers. To the extent that Executive Order 11-01 — and superseding Executive Order 11-72 (issued subsequent to the date Whiley filed her petition) — suspend the rulemak-ing process established by the Florida Legislature under Chapter 120, the Florida Administrative Procedure Act (APA), we conclude that the Governor exceeded his constitutional authority.[4]
*707 I. JURISDICTION
Whiley seeks a writ of quo war-ranto, and it is clear that the Florida Constitution authorizes this Court as well as the district and circuit courts to issue writs of quo warranto. See art. V, §§ 3(b)(8), 4(b)(3) and 5(b), Fla. Const. The term “quo warranto” means “by what authority,” and the writ is the proper means for inquiring into whether a particular individual has improperly exercised a power or right derived from the State. See Fla. House of Reps. v. Crist, 999 So.2d 601, 607 (Fla.2008); Martinez, 545 So.2d at 1339. This Court “may” issue a writ of quo war-ranto which renders this Court’s exercise of jurisdiction discretionary. Art. V, § 3(b)(8), Fla. Const. Furthermore, the Court is limited to issuing writs of quo warranto only to “state officers and state agencies.” Id. The Governor is a state officer. See art. Ill, § 1(a), Fla. Const. (“The governor shall be the chief administrative officer of the state.... ”).
Here, Whiley asserts that the Governor lacked authority to issue Executive Order 11-01 to the extent a portion of the order suspending agency rulemaking exceeds the Governor’s authority and violates the doctrine of separation of powers. Thus, the petition asserts a proper basis for quo warranto relief upon which this Court may exercise its discretionary review. See, e.g., Fla. House of Reps. v. Crist, 999 So.2d 601, 607 (Fla.2008) (concluding that the Court had quo warranto jurisdiction where petitioners sought relief against the governor for exceeding his authority to unilaterally execute a gambling compact expanding casino gambling on tribal lands); Martinez, 545 So.2d at 1339 (deciding that quo warranto was the proper method to test the governor’s power to call a second special session).
As a general rule, unless there is a compelling reason for invoking the original jurisdiction of a higher court, a quo warranto proceeding should be commenced in circuit court. See State ex rel. Vance v. Wellman, 222 So.2d 449, 449 (Fla. 2d DCA 1969). This Court may choose to consider extraordinary writ petitions “where the functions of government would be adversely affected absent an immediate determination by this Court.” Chiles, 714 So.2d at 457; see, e.g., Allen v. Butterworth, 756 So.2d 52, 55 (Fla.2000) (entertaining jurisdiction on a petition for writ of mandamus where failure to resolve the issue would result in a large number of postconviction death case proceedings being in “limbo,” and where the responsibilities of a large number of state-employed attorneys would be affected); Moreau v. Lewis, 648 So.2d 124, 125-26 n. 4 (Fla.1995) (entertaining jurisdiction on a mandamus petition which sought to invalidate a portion of a General Appropriations Act that required Medicaid recipients to make a $1 co-payment for pharmacy services, finding that “an immediate determination is necessary to protect governmental functions,” and noting that there was no relevant factual dispute which would require “extensive fact-finding”). Moreover, in Harvard v. Single *708 tary, 733 So.2d 1020, 1021-22 (Fla.1999), this Court explained that it would “decline jurisdiction and transfer or dismiss writ petitions which ... raise substantial issues of fact or present individualized issues that do not require immediate resolution by this Court, or are not the type of case in which an opinion from this Court would provide important guiding principles for the other courts of this State.” (Emphasis in original).
We find that the present case raises a serious constitutional question relating to the authority of the Governor and the Legislature respectively in rulemaking proceedings. The issue of whether the Governor has the power to suspend agency rulemaking directly and substantially affects the fundamental functions of state government. We also note that a decision from this Court on such an issue would provide important guiding principles to other state courts, and that there do not appear to be any substantial disputes of material fact. Accordingly, we exercise our discretionary jurisdiction and entertain the petition for writ of quo warranto.
II. DISCUSSION
Our precise task in this case is to decide whether the Governor has overstepped his constitutional authority by issuing executive orders which contain certain limitations and suspensions upon agencies relating to their delegated legislative rulemaking authority and the requirements related thereto.[5] We must first consider the constitutional provision of separation of powers in the context of Florida’s APA to determine the proper roles of the executive and legislative branches in that process to determine whether any portion of the executive orders interferes with that authority for the rulemaking process.
Separation of Powers
“[Separation of powers recognizes three separate branches of government — the executive, the legislative, and the judicial — each with its own powers and responsibilities.” Bush v. Schiavo, 885 So.2d 321, 329 (Fla.2004). In applying the separation of powers doctrine, the Court has done so strictly, explaining “that this doctrine ‘encompasses two fundamental prohibitions. The first is that no branch may encroach upon the powers of another. The second is that no branch may delegate to another branch its constitutionally assigned power.’ ” Id. (quoting Chiles v. Chil *709 dren A, B, C, D, E, & F, 589 So.2d 260, 264 (Fla.1991)). Whiley’s petition raises the first prohibition, for which we find the following discussion particularly pertinent in guiding our review:
The separation of powers doctrine is founded on mutual respect of each of the three branches for the constitutional prerogatives and powers of the other branches. Just as we would object to the intrusion of the executive or legislative branches into this Court’s authority to promulgate rules of court procedures or to discipline parties before the courts as in contempt proceedings, we must be equally careful to respect the constitutional authority of the other branches. Art. II, § 3; art. V, §§ 1, 2, 3 and 15, Fla. Const.; Florida Motor Lines v. Railroad Commissioners, 100 Fla. 538, 129 So. 876 (1930); Markert v. Johnston, 367 So.2d 1003 (Fla.1978); Ex parte Earman, 85 Fla. 297, 95 So. 755 (1923). Courts should be loath to intrude on the powers and prerogatives of the other branches of government and, when necessary to do so, should limit the intrusion to that necessary to the exercise of the judicial power.
Orr v. Trask, 464 So.2d 131, 135 (Fla.1985).
Executive Orders 11-01 and 11-72 and Agency Rulemaking
Whether some portion of the content of Executive Order 11-01 along with the superseding executive order, Executive Order 11-72, encroaches upon a function of the legislative branch of government thereby violating separation of powers raises two considerations. First, we must determine the governmental function implicated by those orders. Review of Exee-utive Orders 11-01 and 11-72 themselves is necessary to resolve that issue. Second, we must decide which branch of government is responsible for and has authority over whatever that particular function may be. Constitutional, statutory, and deci-sional law controls resolution of the Court’s latter consideration.
Turning first to the Governor’s executive orders, Executive Order 11-01 provided in pertinent part as follows:
Section 1. I hereby direct all agencies under the direction of the Governor to immediately suspend all rulemaking. No agency under the direction of the Governor may notice the development of proposed rules, amendment of existing rules, or adoption of new rules, except at the direction of the Office of Fiscal Accountability and Regulatory Reform (the “Office”), established herein. The Secretary of State shall not publish rule-making notices in the Florida Administrative Weekly except at the direction of the Office.
Fla. Exec. Order No. 11-01, § 1 (January 4, 2011) (emphasis added).[6] Though the language has been revised, Executive Order 11-72, in pertinent part, also requires the suspension of agency rulemaking until approval is obtained from OFARR:
Section 1. I hereby direct all agencies under the direction of the Governor, prior to developing new rules or amending or repealing existing rules, to submit all proposed notices, along with the complete text of any proposed rule or amendment, to OFARR. These agencies shall also submit any other documentation required by OFARR, and no such agency may submit for publication *710 any required notice without OFARR’s approval.
Fla. Exec. Order No. 11-72, § 1 (April 8, 2011) (emphasis added).[7] The express terms of the executive orders unequivocally reflect that the governmental function at issue is rulemaking and regulation. Observing that the first executive order, which expressly used the words “suspend” and “suspending,” was superseded by the second executive order that issued after Whiley initiated this proceeding, one dissenting opinion concludes that the suspension in the first executive order has been lifted. See Polston, J., dissenting op. at 719. We disagree with that conclusion. Indeed, the only relevant distinction we can discern between the two orders is that Executive Order 11-01 established OFARR, while Executive Order 11-72 continues operation of OFARR. The fact that the Secretary of State is not required to seek OFARR’s approval before publishing notices required by the APA, a factor identified by the dissent, fails to contemplate the corollary provision that “no such agency may submit for publication any required notice without OFARR’s approval.” Rather than engage in a true analysis, one comparing the language of section 1 of the two executive orders, the dissent instead hides behind a discussion of the other sections of Executive Order 11-72— sections that do not address the issue of suspension of rulemaking. See Polston, J., dissenting op. at 719-20.
Turning to rulemaking, we must determine whether the branch responsible for that function is the Legislature, as Whiley asserts, or whether that function is within the executive branch.
Rulemaking is a derivative of lawmaking. An agency is empowered to adopt rules if two requirements are satisfied. First, there must be a statutory grant of rulemaking authority, and second, there must be a specific law to be implemented. § 120.536(1), Fla. Stat. (2010). “Rulemaking authority” is statutory language that explicitly authorizes or requires an agency to adopt rules. § 120.52(17), Fla. Stat. (2010). “Rules” are “statement[s] of general applicability that implement! ], interpret!], or prescribe!] law or policy or describe! ] the procedure or practice requirements of an agency.” § 120.52(16), Fla. Stat. (2010). Accordingly, “[w]hen an agency promulgates a rule having the force of law, it acts in place of the legislature.” Dep’t of Revenue v. Novoa, 745 So.2d 378, 380 (Fla. 1st DCA 1999); cf. Gen. Tel. Co. of Fla. v. Fla. Pub. Serv. Comm’n, 446 So.2d 1063, 1066 (Fla.1984) (“This Court has recognized that agency rulemaking pursuant to statutory authorization, such as the PSC rulemaking in this case, is a quasi-legislative function.”).
Moreover, the Legislature has delegated specific responsibilities to agency heads, such as the authority to determine whether to go forward with proposing, amending, repealing, or adopting rules. See § 120.54(3)(a)(1), Fla. Stat. (2010) (providing that, prior to the adoption, amendment, or repeal of any rule, the agency head must give approval); § 120.54(3)(e)(1), Fla. Stat. (2010) (providing that, prior to the filing of the proposed rule with the Department of State, the agency head must give approval). This authority of the agency head cannot be delegated or transferred. See § 120.54(1)(k), Fla. Stat. (2010). Thus, rulemaking is a legislative function. See Sims v. State, 754 So.2d 657, 668 (Fla. *711 2000) (“[T]he Legislature may ‘enact a law, complete in itself, designed to accomplish a general public purpose, and may expressly authorize designated officials within definite valid limitations to provide rules and regulations for the complete operation and enforcement of the law within its expressed general purpose.’ ”) (quoting State v. Atlantic Coast Line R.R. Co., 56 Fla. 617, 636-37, 47 So. 969, 976 (1908)). The Legislature delegates rulemaking authority to state agencies because they usually have expertise in a particular area for which they are charged with oversight. See Rizov v. State, Bd. of Prof'l Eng’rs, 979 So.2d 979, 980 (Fla. 3d DCA 2008). Accordingly, the Legislature may specifically delegate, to some extent, its rulemak-ing authority to the executive branch “to permit administration of legislative policy by an agency with the expertise and flexibility needed to deal with complex and fluid conditions.”[8] Microtel, Inc. v. Fla. Pub. Serv. Comm’n., 464 So.2d 1189, 1191 (Fla.1985); see also § 120.536(1), Fla. Stat. (2010).[9]
To determine whether the executive orders encroach upon the legislative delegations of rulemaking authority, the Court must first consider the established procedure for rulemaking. When adopting rules, the agencies must specifically conform to the rulemaking procedure enacted by the Legislature as the Florida Administrative Procedure Act in chapter 120, Florida Statutes. First, the agency must provide preliminary notice of the development of the proposed rule in the Florida Administrative Weekly. See § 120.54(2), Fla. Stat. (2010). Second, upon approval of the agency head, the agency must give a more thorough notice of the intended action in the Florida Law Weekly, and this notice must be published at least 28 days prior to the intended action. See § 120.54(3)(a), Fla. Stat. (2010). The agency must file a copy of the proposed rule with the Administrative Procedures Committee as well. See §§ 120.54(3)(a)4; 120.52(4), Fla. Stat. (2010). Third, under certain circumstances and upon the request of any affected person, the agency must provide such persons the opportunity to present evidence and make arguments on all issues under consideration. See § 120.54(3)(c), Fla. Stat. (2010). If all of the statutory requirements are met, the rule is officially “adopted” upon filing with the Secretary of State, and the rule becomes effective twenty days after this filing. See § 120.54(3)(e)6, Fla. Stat. (2010). However, if an agency finds that “an immediate *712 danger to the public health, safety, or welfare requires emergency action,” it may adopt “any rule necessitated by the immediate danger” — i.e., an emergency rule. See § 120.54(4), Fla. Stat. (2010). Otherwise, the agency must comply with the normal procedures for rulemaking. See Fla. Health Care Ass’n v. Agency for Health Care Admin., 734 So.2d 1052, 1053-54 (Fla. 1st DCA 1998).
Both parties rely upon two 1995 executive orders issued by former Governor Lawton Chiles in support of their opposing positions with respect to whether or not Executive Orders 11-01 and 11-72 interfere with the APA. Upon review of Executive Orders 95-74 and 95-256, we conclude that the Chiles orders were clearly limited to review of agency rules and did not suspend or terminate delegated legislative rulemaking authority contrary to the Florida Administrative Procedure Act.
In Executive Order 95-74, Governor Chiles directed each agency under the supervision of the Governor to conduct a review examining the purpose, intent, and necessity of each rule. Agencies were further directed to identify any rules they felt were obsolete or unnecessary. Executive Order 95-74 mandated that the rules then be sent for analysis to the Office of Planning and Budgeting, within the Executive Office of the Governor. When completed, the rules were then to be provided to the Legislature for an opportunity to review the rules and repeal and/or amend any statutes mandating the rules so that the repeal of the rules could be effectuated. Additionally, any rules that an agency itself had discretion to repeal were also to be submitted to the Legislature for its review and comment.
Executive Order 95-256 extended that which was initially designed as a one-time review process in Executive Order 95-74 to an ongoing agency mandate to be conducted every sixty days and to be reported to the Office of the Executive. Fla. Exec. Order No. 95-256, § 2 (July 12, 1995). Executive Order 95-256 also directed agencies to review the Florida Statutes for recommendations as to legislative mandates that could be eliminated, without harm to the public health or safety, thereby reducing the operating costs of government. Fla. Exec. Order No. 95-256, § 3 (July 12, 1995). Executive Order 95-74 further instructed agencies to determine if rules were obsolete or otherwise unnecessary. Executive Order 95-256 expanded this criterion to include rules that achieved objectives that could be accomplished in a more efficient, or less expensive or intrusive manner; rules that were overly precise; or rules that duplicated other rules. Fla. Exec. Order No. 95-256, § 2 (July 12, 1995). Executive Order 95-256 also created the Governor’s APA Review Commission, which was responsible for recommending changes to the APA to legislative leaders as well as the Governor.
There are limited similarities between the 1995 and 2011 executive orders not really at issue in this case. For example, both establish a review of rules promulgated by executive agencies under the direction of the Governor to take place to determine if any rules are unnecessary, and both direct that agencies pursue to repeal or amend any rule identified as unnecessary. Each also mandates that the agencies’ findings be submitted to the Executive Office of the Governor on a regular basis. Aside from these review similarities, however, the 1995 executive orders and Executive Orders 11-01 and 11-72 differ in two substantial and material respects.
First, the Chiles orders did not provide for an additional review body to have authority over the decisions reached by the agencies themselves. While each of the *713 identified executive orders mandated that agencies under the Governor’s direction must review their rules and submit a report of any unnecessary rules, Governor Scott’s executive orders create an office outside the agencies that has independent review power as well. Fla. Exec. Order No. 11-72, § 3 (April 8, 2011). OFARR was created to operate in the Executive Office of the Governor and has the ability to review not only existing rules to ensure they do not adversely or unreasonably affect businesses or job growth and to ensure that they do not impose unjustified overall costs on the government or consumers, but also rules to be proposed in the future. See id. In contrast, the Chiles executive orders allowed the agencies themselves to solely retain the power to review agency rules and subsequently seek the repeal of those rules.
Second, the Chiles executive orders did not change the agencies’ process for proposing, amending, or repealing rules. Each Governor’s action substantially and materially differs with regard to how both proposed rules, as well as established rules that are sought to be amended or repealed, are treated. Executive Order 11-72 mandates that absolutely no required notice may be published without the approval of OFARR. Fla. Exec. Order No. 11-72, § 1 (April 8, 2011). Pursuant to the APA, however, agencies are required to provide notice prior to the adoption, amendment, or repeal of any rule (other than an emergency rule). § 120.54(3)(a)(l), Fla. Stat. (2010). Executive Order 11-72 mandates that agencies receive OFARR approval before taking any of these three rulemaking actions. Significantly, Executive Order 95-256 contains no provision requiring an entity within the Executive Office of the Governor to approve rulemaking activity. Thus, under the 1995 executive orders, agencies were free to engage in the proposal, amendment, and repeal of rules without approval from a member of the Executive Office of the Governor.
Suspension
The foregoing leads the Court to conclude that the Governor’s executive orders at issue here, to the extent each suspends and terminates rulemaking by precluding notice publication and other compliance with Chapter 120 absent prior approval from OFARR — contrary to the Administrative Procedure Act — infringe upon the very process of rulemaking and encroach upon the Legislature’s delegation of its rulemaking power as set forth in the Florida Statutes. Whether the Governor exceeded his authority derived from state law does not turn upon the number of times the encroachment occurred or whether petitioner was personally affected by it. Issuance of Executive Order 11-72, and specifically section 1, suspends rulemaking; the precise language therein leads the Court to that inescapable conclusion. One colleague’s dissent suggesting that this opinion questions the Governor’s authority to issue Executive Order 11-72, see Polston, J., dissenting op. at 718, is a red herring.
Constitutional Authority
The Governor argues that his authority for establishing OFARR and the duties and responsibilities thereunder derives from the Florida Constitution, art. IV, sec. 1(a). That provision reads as follows:
The supreme executive power shall be vested in a governor, who shall be eom-mander-in-chief of all military forces of the state not in active service of the United States. The governor shall take care that the laws be faithfully executed, commission all officers of the state and counties, and transact all necessary business with the officers of government. *714 The governor may require information in writing from all executive or administrative state, county or municipal officers upon any subject relating to the duties of their respective offices. The governor shall be the chief administrative officer of the state responsible for the planning and budgeting for the state.
Art. IV, § 1(a), Fla. Const.
Previously presented in an attorney general opinion dated July 8, 1981, in relevant part, was the following question: “1. Can the Governor by executive order ... give binding directions to state agencies to implement and comply with Florida’s Coastal Zone Management Plan without violating the requirements of the Florida Administrative Procedure Act?” Op. Att’y Gen. Fla. 81 — 49, at 1 (1981). There it was opined that section 1(a) of article IV of the Florida Constitution did not confer upon the governor “any power of direct control and supervision over all state agencies .... ” Id. at 2. As explained by that opinion, “to hold otherwise, would render the plain language [Executive departments] of s. 6, Art. IV, meaningless.” Id. The attorney general opinion addresses an issue comparable to that raised in the instant petition. Because the department heads,[10] and not the Governor, shall direct the powers, duties, and functions vested in a department, the opinion stated that the Governor could not give binding directions to any state executive department to comply with a particular plan or act, or exercise rulemaking authority “in that regard over or for such executive departments, absent some specific authorization in part II of ch. 380, F.S.,[11] or other general law, which would permit such.” Id. at 3.
Although not binding upon this Court, see Inquiry Concerning a Judge, re Holder, 945 So.2d 1130, 1132 (Fla.2006), we find persuasive attorney general opinion 81-49. If article IV, section 1(a) of the Florida Constitution does not authorize the Governor to direct the manner in which an executive agency shall proceed under a statutory act, we reject the proposition that that same constitutional provision authorizes the Governor to suspend, terminate, and control agency rulemaking contrary to the APA, as contrasted with review of agency rulemaking.[12]
*715 With apparent disregard for the Court’s precedent, the dissents deem the Governor all-powerful as “the supreme executive power” by virtue of article IV, section 1(a) of the Florida Constitution. See Canady, C.J., dissenting op. at 717; Polston, J., dissenting op. at 724. The phrase “supreme executive power” is not so expansive, however, and to grant such a reading ignores the fundamental principle that our state constitution is a limitation upon, rather than a grant of, power. See, e.g., State ex rel. Kennedy v. Lee, 274 So.2d 881, 882 (Fla.1973); Bd. of Pub. Instruction v. Wright, 76 So.2d 863, 864 (Fla.1955). Moreover, the dissents’ failure to address the provisions of the APA delegating to agency heads the authority to determine whether to go forward with proposing, amending, repealing, or adopting rules — i.e., sections 120.54(3)(a)(1) and 120.54(3)(e)(1), Florida Statutes (2010) — an authority that cannot be delegated by any entity other than the Legislature, demonstrates the absence of support for the position advanced.
In support of the requirements under Executive Orders 11-01 and 11-72, the Governor also relies upon his supervisory power under article IV, section 6 of the Florida Constitution. That provision provides, in pertinent part, as follows: “The administration of each department, unless otherwise provided in this constitution, shall be placed by law under the direct supervision of the governor, ... or an officer or board appointed by and serving at the pleasure of the governor.... ” The Governor argues, consequently, that he has the authority — at will — to remove agency heads who serve at his pleasure. See art. IV, § 6, Fla. Const.
The dissents similarly give expansive interpretation to the “serving at the pleasure of the governor” phrase in article IV, section 6 of the Florida Constitution. See Canady, C.J., dissenting op. at 717; Polston, J., dissenting op. at 724. Apparently, the dissents believe that the Legislature only intended that the agency head not be permitted to redelegate or transfer the delegated power to approve pursuant to section 120.54(1)(k), Fla. Stat. (2010) within the agency, and that, in light of the Governor’s gatekeeper role in deciding what rules would be proposed, the agency head’s role pursuant to sections 120.54(3)(a)(1) and 120.54(3)(e)(1) is nothing more than that of a figurehead, whose authority is purely illusory.
We reject the Governor’s and the dissents’ interpretation of article IV, section 6 of the Florida Constitution; the power to remove is not analogous to the power to control. This is particularly the case where the delegated authority is a legislative function and the Legislature has expressly placed the power to act on the delegated authority in the department head, and not in the Governor or the Executive Office of the Governor. See § 20.05(l)(a), (e), Fla. Stat. (2010). In this case, Executive Orders 11-01 and 11-72 supplant legislative delegations by redefining the terms of those delegations through binding directives to state agencies, i.e., first by suspending and terminating rule-making, second, by requiring agencies to submit to OFARR any amendments or new rules the agency would want to propose, and then by causing OFARR to interject itself as the decisive entity as to whether and'what will be proposed.
Legislative Delegation to Executive or Amendment to Chapter 120[13]
Finally, the last possible source of authority for the Governor’s action in requir *716 ing prior approval by OFARR before the legislative delegation of rulemaking may occur would be by either legislative delegation or direct amendment to Chapter 120. The Legislature previously has, in specifically delineated terms and circumstances, delegated to the Executive Office of the Governor certain responsibility for the oversight of rulemaking. See, e.g., § 14.2015, Fla. Stat. (2010),[14] and § 288.7015, Fla. Stat. (2010). These two statutes demonstrate that the Legislature understands how to confer upon the Governor the authority to oversee agency rule-making when it so desires. See Cason v. Fla. Dep’t of Mgmt. Servs., 944 So.2d 306, 315 (Fla.2006) (“In the past, we have pointed to language in other statutes to show that the Legislature ‘knows how to’ accomplish what it has omitted in the statute in question”).[15]
Another possible source of delegation of rulemaking authority to the Governor would be by amendment to the APA with specific provisions directed to the Executive Office of the Governor. With the enactment of section 120.745, Florida Statutes, on June 24, 2011, upon the Governor’s signature of House Bill 993, see Ch.2011-225, § 5, Laws of Fla., the Legislature essentially approved the process by which OFARR reviews agency rules that have already been promulgated. However, by its own terms, section 120.745, which pertains to legislative review of agency rules, is limited to those rules “in effect on or before November 16, 2010.” Thus, the recent amendment to Chapter 120 applies to only the process by which OFARR reviews existing rules; in contrast, it does not authorize the provisions in Executive Orders 11-01 and 11-72 that suspend or terminate rulemaking.
III. CONCLUSION
We distinguish between the Governor’s constitutional authority with respect to the provisions of the executive orders pertaining to review and oversight of rulemaking within the executive agencies under his control, and the Legislature’s lawmaking authority under article III, section 1 of the Florida Constitution. The Legislature retains the sole right to delegate rulemaking authority to agencies, and all provisions in *717 both Executive Order 11-01 or 11-72 that operate to suspend rulemaking contrary to the APA constitute an encroachment upon a legislative function. We grant Whiley’s petition but withhold issuance of the writ of quo warranto. We trust that any provision in Executive Order 11-72 suspending agency compliance with the APA, i.e., rule-making, will not be enforced against an agency at this time, and until such time as the Florida Legislature may amend the APA or otherwise delegate such rulemak-ing authority to the Executive Office of the Governor.
It is so ordered.
PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, C.J., dissents with an opinion, in which POLSTON, J., concurs.
POLSTON, J., dissents with an opinion, in which, CANADY, C.J., concurs.

. It is most unfortunate that the dissenting opinion of Justice Polston fails to comprehend the fact that parts of an executive order may be valid while other aspects are invalid. See Polston, J., dissenting op. at 718. Under such circumstances the executive order is unconstitutional in part. An invalid section of an executive order cannot survive constitutional scrutiny by riding on the coattails of the valid portions. Even if sections of the Governor’s executive order may be valid, the provisions that are contrary to constitutional requirements simply cannot escape without analysis.

. The requisite duties of the Executive Office of the Governor are specifically identified un *706 der section 216.151, Florida Statutes (2010), and those duties pertain to state planning and budgeting.

. Apparently the act of issuing a second executive order that superseded the first executive order, excluding the word "suspend,” was sufficient for one colleague to conclude that, unlike its predecessor, Executive Order 11-72 does not operate to suspend rulemaking. See Polston, J., dissenting op. at 719. We address what seems nothing more than a sleight of hand within our discussion of the two executive orders. Infra at 710.

. In addition to her status as a citizen and taxpayer, Whiley also alleged that as a blind food stamp recipient who is required to periodically reapply for benefits and who uses the online Food Stamp application form incorporated in Rule 65A-1.205 of the Florida Administrative Code (Eligibility Determination Process), she is negatively impacted by the operation of Executive Order 11-01. We need not address Whiley's allegations on this point, however, as the extent of harm to the petitioner is not pertinent to the Court’s inquiry under quo warranto, and is simply an *707 attempt by the dissent to divert attention. See Polston, J., dissenting op. at 719-20. Rather, a petition for writ of quo warranto is directed at the action of the state officer and whether such action exceeds that position’s constitutional authority. See Martinez v. Martinez, 545 So.2d 1338, 1339 (Fla.1989) (in addressing the issue of standing, stating that "[i]n quo warranto proceedings seeking the enforcement of a public right the people are the real party to the action and the person bringing suit 'need not show that he has any real or personal interest in it.’ ") (emphasis added; citing State ex rel. Pooser v. Wester, 126 Fla. 49, 170 So. 736, 737 (1936)). Thus, when bringing a petition for writ of quo warranto, individual members of the public have standing as citizens and taxpayers. See Chiles v. Phelps, 714 So.2d 453, 456 (Fla.1998).

. For this reason, we find the Governor’s supplemental authority not pertinent to the issue before the Court. The Governor cites to three administrative cases — Etienne v. Dep’t of Children and Family Servs., Case Nos. 10-5141RX, 10-9516RP, 10-10105RP (DOAH Nov. 11, 2010) — as well as an interlocutory appeal filed in the Third District Court of Appeal arising from one of the administrative cases — Etienne v. Florida Dep’t of Children and Family Services, Case No. 3D11-461, 2011 WL 4360094. The Governor informs the Court that each case has been dismissed as moot. The administrative cases either raised the issue of whether Florida's online food stamp application form, adopted through a state regulatory rule, violated federal law, or were related to that issue. Whiley, in addition to relying upon her status as a citizen and taxpayer, argued she was personally affected by the operation of the Governor’s issuance of Executive Order 11-01 because she was subject to the regulation requiring reapplication for food stamp benefits. However, this case is not an administrative challenge, but concerns whether the Governor exceeded his authority due to the effect, in part, of Executive Orders 11-01 and 11-72. As previously stated, quo warranto does not require that a petitioner have a real and personal interest in the public official’s action at issue. Accordingly, the individual operation of the regulation at issue in the Etienne cases (of which neither party in the instant case was a party), and that those cases are now dismissed, is not pertinent to our resolution of this case.

. Executive Order 11-01 included other provisions as well. In addition to the provisions that directly or effectively suspended rulemak-ing, others required review of already existing rules. Those provisions of the executive order are not the subject of the petition for relief.

. Executive Order 11-72, as was the case with the original executive order on the subject, includes provisions in addition to those alleged to suspend agency rulemaking. Those provisions are also not at issue in this proceeding.

. The Legislature’s delegation of its rulemak-ing power itself may be subject to challenge on the basis that it runs afoul of the nondele-gation doctrine. See Sims v. State, 754 So.2d 657, 668 (Fla.2000) ("Generally, the Legislature may not delegate the power to enact a law or the right to exercise unrestricted discretion in applying the law.”). In this case, however, the extent of any rulemaking delegation is not at issue.

. Section 120.536 provides in pertinent part as follows:
(1) A grant of rulemaking authority is necessary but not sufficient to allow an agency to adopt a rule; a specific law to be implemented is also required. An agency may adopt only rules that implement or interpret the specific powers and duties granted by the enabling statute. No agency shall have authority to adopt a rule only because it is reasonably related to the purpose of the enabling legislation and is not arbitrary and capricious or is within the agency’s class of powers and duties, nor shall an agency have the authority to implement statutory provisions setting forth general legislative intent or policy. Statutory language granting rulemaking authority or generally describing the powers and functions of an agency shall be construed to extend no further than implementing or interpreting the specific powers and duties conferred by the enabling statute.
§ 120.536(1), Fla. Stat. (2010).

. Section 20.05, Florida Statutes (2010), provides in pertinent part that “(1) Each head of a department, except as otherwise provided by law, must: ... (e) [s]ubject to the requirements of chapter 120, exercise existing authority to adopt rules pursuant and limited to the powers, duties, and functions transferred to the department;....” § 20.05(l)(e), Fla. Stat. (2010). "Department” is the principal administrative unit of or within the executive branch, §§ 20.03(2) and 20.04(1), and "the individual or board in charge of the department” is the "[h]ead of the department.” § 20.03(4).

. Chapter 380 of the Florida Statutes, Land and Water Management, includes, in Part II, the Florida Coastal Planning and Management Act at issue in the attorney general's opinion numbered 81-49.

.The Court has carefully reviewed the arguments against application of attorney general opinion 81-49 raised by Attorney General Bondi in her amicus brief in support of the Governor. Those arguments include the following: the Governor merely established an across-the-board process by which rules and proposed rules will be reviewed; the relevance of the attorney general opinion has been lessened by the subsequently adopted administrative accountability regime, including that the Governor’s powers relating to his oversight of executive agencies has been expanded, especially in light of the passage of Amendment 4 and section 20.051, Florida Statutes; and no subsequent opinion of the Attorney General has cited this particular attorney general opinion. These arguments fail to take into account the distinction between OFARR’s review function, which does not run afoul of separation of powers, and OFARR's *715 initial rulemaking role as a “gatekeeper,” which does.

. Although the parties did not address the potential import of legislative delegation of *716 rulemaking authority to the Executive in their pleadings before the Court, the issue did arise at oral argument based upon a filing of supplemental authority by the Governor.

. The Legislature repealed section 14.2015 during the 2011 legislative session, Ch.2011-142, § 477, Laws of Fla., in the course of .transferring the functions and trust fund of the Office of Tourism, Trade, and Economic Development to the newly created Department of Economic Opportunity, Ch.2011-142, § 4(1), Laws of Fla.

. This principle is of particular import here, as the two statutory provisions expressly provided for substantially the same goals the Governor subsequently sought through Executive Orders 11-01 and 11-72. For example,
[t]he purpose of the Office of Tourism, Trade, and Economic Development is to assist the Governor in working with the Legislature, state agencies, business leaders, and economic development professionals to formulate and implement coherent and consistent policies and strategies designed to provide economic opportunities for all Floridians.
§ 14.2015(2), Fla. Stat. (2010). The “rules ombudsman” that the Governor is to appoint in the Executive Office of the Governor is to consider "the impact of agency rules on the state's citizens and businesses.” § 288.7015, Fla. Stat. (2010). Specifically, the rules ombudsman is charged with, for example, reviewing "state agency rules that adversely or disproportionately impact businesses, particularly those relating to small and minority businesses,” § 288.7015(2), Fla. Stat. (2010), and to "[m]ake recommendations on any existing or proposed rules to alleviate unnecessary or disproportionate adverse effects to businesses,” § 288.7015(3), Fla. Stat. (2010).