THOMAS, J.,
concurring in result only, and dissenting in part.
I concur in the result only, as Mr. West-phal established through unrefuted expert testimony that he was totally disabled at the expiration of temporary disability benefits and would remain totally disabled after he reached maximum medical improvement (MMI). Thus he was entitled to permanent total disability (PTD) benefits as a matter of law, under our rule announced fifteen years ago in City of Pensacola Firefighters v. Oswald, 710 So.2d 95, 98 (Fla. 1st DCA 1998), and reaffirmed in Matrix Employee Leasing, Inc. v. Hadley, 78 So.3d 621 (Fla. 1st DCA 2011). Furthermore, in addition to our prior authority, reversal is mandated under the Florida Supreme Court’s decision in Wald v. Grainger, 64 So.3d 1201 (Fla.2011). Therefore, the Judge of Compensation Claims (JCC) erred as a matter of law in denying Mr. Westphal relief.
I vigorously dissent, however, from the majority’s opinion, which in my view violates Florida’s “strict” separation of powers provision in article II, section three of the Florida Constitution. Fla. House of Representatives v. Expedia, Inc., 85 So.3d 517 (Fla. 1st DCA 2012). The majority opinion enacts new substantive law that creates a legal entitlement to permanent total disability benefits at the expiration of temporary total disability benefits, regardless of whether the claimant will remain totally disabled when reaching maximum medical improvement.
Article II, section three of our state constitution provides: “The powers of the state government shall be divided into legislative, executive and judicial branches. No person belonging to one branch shall exercise any powers appertaining to either of the other branches unless expressly provided herein.” As we recently stated in Expedia, “The importance of this provision cannot be overstated. Our supreme court described the separation of powers as the ‘cornerstone of American democracy’ ... [and] stated that Florida has traditionally applied a ‘strict separation of powers doc *452 trine.’ ” 85 So.3d at 524 (quoting Bush v. Schiavo, 885 So.2d 321, 329 (Fla.2004) (emphasis added)); Holly v. Auld, 450 So.2d 217, 219 (Fla.1984) (holding that “courts of this state are ‘without power to construe an unambiguous statute in a way which would extend, modify, or limit, its express terms or its reasonable and obvious implications. To do so would be an abrogation of legislative power.’ ”) (quoting Am. Bankers Life Assurance Co. of Fla. v. Williams, 212 So.2d 777, 778 (Fla. 1st DCA 1968) (emphasis added)); State v. Egan, 287 So.2d 1, 7 (Fla.1973) (recognizing that “[u]nder our constitutional system of government, however, courts cannot legislate.”). By enacting substantive law, the majority opinion has unconstitutionally encroached on the legislative branch’s power, in violation of Florida’s strict separation of powers.
I. The Majority Opinion Enacts Substantive Law In Violation of article II, section three of the Florida Constitution, and Unnecessarily Departs From the Judicial Policy of Stare Decisis
Our supreme court decided more than forty years ago that only the legislature, not the judiciary, has the authority to write the law imposing limits on temporary total disability indemnity benefits. Thompson v. Fla. Indus. Comm’n, 224 So.2d 286, 287 (Fla.1969) (stating: “The Florida Workmen’s Compensation Act is inadequate in failing to provide for a situation such as this. However, the remedy lies with the Legislature and not with the Florida Industrial Commission or the Court.”). The majority opinion, in my view, abrogates legislative power by transforming a statutory limitation of temporary disability benefits, which was enacted to reduce costs, into an entitlement to permanent disability benefits. The majority opinion thus disregards express legislative intent to reduce costs imposed on Florida’s employers from inappropriate awards of permanent total disability benefits.[6]
The majority’s attempt to distinguish Thompson in footnote 1 of its opinion is completely unavailing, as the majority’s rationale for its entire decision is fundamentally flawed. It erroneously equates impairment with disability, and then proceeds to build a house of cards on this flawed concept. See Texas Workers’ Compensation Comm’n v. Garcia, 893 S.W.2d 504, 516 (Tex.1995) (discussing fundamental difference between impairment and disability, using example of similar injuries to concert pianist and bank president, stating: “Impairment benefits compensate for non-economic aspects of an injury ... while disability benefits compensate for direct economic harm.” (emphasis added); see also Bradley v. Hurricane Restaurant, 670 So.2d 162, 165 (Fla. 1st DCA 1996) (noting that “impairment is one accepted criterion for measuring benefits” and rejecting argument that statute is unconstitutional because it bases impairment bene *453 fits on permanent impairment rating “and has no relation to the claimant’s actual disability or actual wage loss.”) (emphasis added). Thus, the majority’s attempt to distinguish the binding precedent of Thompson must fail as a matter of law and logic, as the addition of impairment provisions to the statute are irrelevant to the holding in Thompson.
The majority opinion also disregards the Legislature’s explicit approval of our two previous decisions in Oswald and Hadley, in its amicus curiae brief filed here. In addition, the majority opinion disregards the fact that the legislature has not acted to amend the relevant statutes we have interpreted for fifteen years.
Although courts have the constitutional authority to find statutes unconstitutional if the general law violates the superior organic law, the majority opinion specifically eschews any claim that the current law is in fact unconstitutional. The majority opinion states only that the constitutional issue previously addressed here casts the statute in a “new light,” and Judge Wolf, writing for two of the eight members of the court joining the majority opinion, disclaims any view that our previous holdings in Oswald and Hadley render the relevant statutes unconstitutional.
In contrast with the majority opinion, our prior decision in Oswald, which we recently reaffirmed in Hadley, maintains the limitation of temporary total disability benefits, consistent with the original legislative intent. In the House of Representative’s Final Bill Analysis of Chapter 93-415, Laws of Florida, the staff analysis noted that the newly limited section 440.15, Florida Statutes, “[ajmends provisions regarding the length of temporary benefits not to exceed 104 weeks, rather than the 260 weeks in current law.” See “House of Representatives, As Further Revised By the Committee on Commerce, Final Bill Analysis & Economic Impact Statement,” § 20, pg. 11 (Nov. 30,1993). Similarly, the Senate Staff Analysis states that the new 104-week limitation means that “Temporary total disability benefits are limited, to 104 weeks, rather than the current duration of 260 weeks. Once the employee reaches the maximum number-of weeks, temporary disability benefits will cease and a determination is required to be made of the injured worker’s permanent impairment.” See “Senate Staff Analysis and Economic Impact Statement,” Senate Bill 12-C, October 29, 1993 (emphasis added). Nowhere does either the House or Senate staff analysis even imply that the changes to the workers’ compensation act limiting temporary total disability benefits to 104 weeks somehow creates an entitlement for a disabled claimant to immediately receive permanent disability indemnity benefits, regardless of whether the injured worker has reached maximum medical improvement.
The majority opinion thus constitutes judicial legislation in violation of article II, section three of the Florida Constitution, because the opinion amends the statutory definition of maximum medical improvement to allow a claim for permanent disability indemnity benefits, regardless of whether the claimant will be totally disabled when reaching maximum medical improvement. The majority opinion also amends the definition of impairment rating by conflating it with the definition of disability and merging the two concepts, as discussed above. Finally, the majority opinion amends the statutory definition of permanent total disability benefits, as such benefits will now be available to persons who will in fact not be totally disabled when they reach maximum medical improvement. All of these changes are implemented not by the legislature, the proper constitutional branch, but by the *454 majority opinion’s new version of the statute, which has no basis in text, prior case law, or legislative intent.
This new version of the statute thus enacts substantive law that will likely have serious and unexpected consequences.[7] This is precisely why Florida’s organic law assigns the legislative power only to the Legislature, which is the body better suited to enact substantive law, as it utilizes a lengthy process of committee meetings and bicameral review, and any passed laws are subject to a potential gubernatorial veto. But here, the majority opinion enacts new law and thereby substitutes its policy preferences for the legislature’s enacted law, without constitutional authority under article II, section three of the Florida Constitution.
By crafting a new statute in derogation of the plain text, the majority opinion thus fails to properly defer to the Florida Legislature: “Although the line of demarcation is not always clear, we have noted that the 'legislature’s exclusive power encompasses questions of fundamental policy and the articulation of reasonably definite standards to be used in implementing those policies.’ ” Fla. House of Representatives v. Crist, 999 So.2d 601, 611 (Fla.2008) (quoting B.H. v. State, 645 So.2d 987, 993 (Fla.1994) (emphasis added)). In Florida House of Representatives, the Florida Supreme Court recognized that the legislature’s broad policy-making power was only limited by the specific restrictions mandated in organic law. 999 So.2d at 612 (holding that “even if the Governor has authority to execute compacts, its terms cannot contradict the state’s public policy, as expressed in its laws.” (Emphasis added)).
Surprisingly, the majority opinion holds that “a worker who is totally disabled as a result of a workplace accident and remains totally disabled by the end of his or her eligibility for temporary total disability benefits is deemed to be at maximum med *455 ical improvement by operation of law and is therefore eligible to assert a claim for permanent and total disability benefits.” (Majority Opinion, pg. 3; emphasis added.) But this is not a novel concept. Since our decision in Oswald, a claimant can now file a claim for permanent and total disability benefits despite the fact he has not reached MMI. Oswald, 710 So.2d at 98 (“to be eligible for permanent total disability benefits, an employee whose temporary benefits have run out-or are expected to do so imminently-must be able to show not only total disability upon the cessation of temporary benefits but also that total disability will be ‘existing after the date of maximum medical improvement.’ ”) (quoting § 440.02(19), Fla. Stat.; emphasis added)). Since Oswald, such a claim has never been classified as “premature” merely because the claimant has not reached MMI.
The majority opinion again repeats this incorrect premise when it concludes by stating: “[W]e hold that Mr. Westphal’s claim for permanent and total disability benefits is not premature. If he can prove that he is totally disabled, he is entitled to receive his benefits now and he need not wait until such time in the future as he can offer medical proof that he has reached the point of maximum medical improvement.” (Majority opinion, pg. 17; emphasis added.) But under current law, this claim is not legally “premature.” In this very case, for example, the record facts are not in dispute that Mr. Westphal was totally disabled when he asserted his claim for PTD benefits, even though he had not reached MMI. The majority opinion acknowledges this fact: “Mr. Westphal sought and obtained temporary total disability benefits for a period of 104 weeks but he was still totally disabled at the time those benefits expired.” (Majority opinion, pg. 5.) The City never claimed otherwise; rather, the issue here, as in all such cases since Oswald, was whether Mr. Westphal will remain disabled “after the date of maximum medical improvement.” Oswald, 710 So.2d at 98.
So why remand the case for any purpose other than to enter judgment in favor of Mr. Westphal? Under the majority’s new version of the statute, there is nothing left for Mr. Westphal to prove, as the majority opinion declares that “an injured worker who is still totally disabled at the end of his or her eligibility for temporary disability benefits is deemed to be at maximum medical improvement as a matter of law, even if the worker may get well enough someday to return to work.... [T]he claimant need not present medical proof that he or she has reached maximum medical improvement. The worker may immediately assert a claim for permanent total disability benefits, and the judge may award those benefits if the worker has proven that he or she is in fact totally disabled.” (Majority opinion, pg. 8; emphasis added.) Again, Mr. Westphal has already proven he was disabled when his temporary total disability benefits expired, and under current law, the status of maximum medical improvement was not dispos-itive; rather, the ultimate question was whether the claimant' would remain totally disabled if and when he reached maximum medical improvement. Under the majority opinion’s new judicial legislation, however, Mr. Westphal is once again relegated to a legal twilight zone where he is required to prove what he has already proven, that is, that he was totally disabled when he reached the expiration of 104 weeks of temporary total disability indemnity benefits.
The majority opinion should not force Mr. Westphal to engage in a waste of judicial resources, as under the majority’s new version of the statute, Mr. Westphal prevails as a matter of law. He has al *456 ready proven that he was totally disabled at the expiration of 104 weeks of temporary total disability benefits, and thus he is entitled to receive permanent total disability benefits. It is now legally irrelevant whether Mr. Westphal, or any other claimant in his position, will remain totally disabled when he reaches maximum medical improvement.
As I discuss in Part II of this opinion, the majority’s holding enacting new substantive law is unnecessary, because Mr. Westphal was entitled to prevail under current law, as he proved through unrefut-ed expert testimony that he would remain totally disabled, both at the time his temporary disability indemnity benefits expired and when he would eventually reach MMI. The rule this court recognized in Oswald, and affirmed for fifteen years, properly adheres to the statute, and does not allow a JCC to avoid making a decision when a claimant produces unrefuted expert medical and vocational testimony establishing that he is and will remain totally disabled upon reaching maximum medical improvement. Thus, we should adhere to our settled precedent and reverse only to direct the JCC to enter judgment for Mr. Westphal and require the payment for permanent total disability benefits for the period between the expiration of his temporary benefits and the time the City accepted his claim for permanent benefits.
Under article II, section three of the Florida Constitution, only the legislature can enact new policies regarding whether and how a disabled claimant may assert a claim for permanent disability. As the Florida Supreme Court stated in Whiley v. Scott, 79 So.3d 702, 708-09 (Fla.2011):
‘[Separation of powers recognizes three separate branches of government — the executive, the legislative, and the judicial — each with its own powers and responsibilities.’ In applying the separation of powers doctrine, the Court has done so strictly, explaining ‘that this doctrine ‘encompasses two fundamental prohibitions. The first is that no branch may encroach upon the powers of another.’ ’ ”
(Emphasis added; citation omitted.)
The majority opinion encroaches upon the power of the Florida Legislature by creating a newly defined “statutory” or “deemed” maximum medical improvement date, to automatically exist at the expiration of temporary total disability benefits, and declaring that at this point the claimant who is totally disabled is entitled to permanent total disability indemnity benefits, regardless whether the claimant will remain disabled at maximum medical improvement.
The majority opinion bases this new interpretation on a purported interplay between the definitions of “permanent impairment” contained in sections 440.02(22) and 440.15(3)(d) and the limitation of temporary total disability benefits contained in section 440.15(2)(a), Florida Statutes. The legislature has in fact defined “maximum medical improvement” in unambiguous terms, and therefore there can be no proper use of a canon of judicial construction to avoid this clear definition. Knowles v. Beverly Enters.-Fla., Inc., 898 So.2d 1, 5 (Fla.2004) (holding where language is clear and unambiguous, “there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning”) (quoting Holly v. Auld, 450 So.2d 217, 219 (Fla.1984), which quotes A.R. Douglass, Inc. v. McRainey, 102 Fla. 1141, 137 So. 157, 159 (1931)).
The legislature has defined MMI as follows: “ ‘Date of maximum medical improvement’ means the date after which further recovery from, or lasting improvement to, an injury or disease can no longer *457 reasonably be anticipated, based upon reasonable medical probability.” § 440.02(10), Fla. Stat. (emphasis added). We have no constitutional authority to evade this unambiguous definition, as recognized by our supreme court in State v. Egan:
‘The Legislature must be understood to mean what it has plainly expressed, and this excludes construction.... Even where a court is convinced that the Legislature really meant and intended something not expressed in the phraseology of the act, it will not deem itself authorized to depart from the plain meaning of the language which is free from ambiguity. If a legislative enactment violates no constitutional provision or principle, it must be deemed its own sufficient and conclusive evidence of the justice, propriety, and policy of its passage. Courts have then no power to set it aside or evade its operation by forced or unreasonable construction.’
287 So.2d 1, 4 (Fla.1973) (quoting Van Pelt v. Hilliard, 75 Fla. 792, 78 So. 693, 694-95 (1918)).
Interestingly, only one state has defined maximum medical improvement in the terms enacted by the majority opinion, and in that state, the definition was enacted by the body of elected representatives of the people. In Texas, by statute, a claimant is deemed to have reached maximum medical improvement when the claimant’s temporary disability benefits expire. Texas Labor Code sections 401.11(30)(a) and (b) (2009) define maximum medical improvement, in part, as “the earliest date after which ... further improvement to an injury can no longer be reasonably anticipated” or “the expiration of 104 weeks from the date on which income benefits begin to accrue,” whichever is earlier.[8] No other state so defines the term maximum medical improvement, either by statute or judicial opinion. But the majority opinion declares that henceforth maximum medical improvement shall not mean what the legislature says it means, but it shall mean what the majority opinion thinks the statute should say, that is, when the disabled claimant’s temporary indemnity benefits have expired. Thus, the majority opinion engrafts Texas statutory law onto Florida’s statute, in abrogation of legislative power.
In my view, rather than defer to the proper branch of government, the majority opinion rewrites a statute that has been interpreted by this court for fifteen years in a manner explicitly approved by the Florida Legislature in this very case. Thus, again noting our supreme court’s admonishment in Egan, “The court has no more right to abrogate the common law than it has to repeal the statutory law.... [A] legislative enactment may be repealed only by further legislation and not by time or changed conditions.” 287 So.2d at 6-7 (emphasis added). Thus, the majority opinion violates both the Florida Constitution’s requirement of the separation of powers and the venerable principle of *458 stare decisis. By doing so, the decision will create uncertainty in the law and instability in the workers’ compensation system.
In addition to enacting substantive law, the majority opinion is not only receding from this court’s recent en banc opinion in Hadley, as the opinion' acknowledges, but also recedes from fifteen years of settled law, originating in Oswald.[9] Thus, not only does the opinion make law, in violation of the strict separation of powers mandate in article II, section three of the Florida Constitution, it also violates the venerable principle of stare decisis. Thus, although I agree and concur with Judge Wetherell’s discussion of stare decisis in his dissenting- opinion, I disagree with his conclusion that Mr. Westphal did not demonstrate entitlement to permanent and total disability benefits under the current law.
Ultimately, the majority opinion fails to delineate any persuasive analysis for violating the venerable judicial policy of stare decisis, especially where the majority opin *459 ion enacts judicial legislation in violation of organic law. In addition, the majority fails to even address, much less analyze, what impact it will have on 1) workers’ compensation insurance rates; 2) litigation expectations; 3) employers’ willingness to agree to awards of temporary total disability payments, when under the majority view, such concessions will now be tantamount to a concession to the award of permanent disability indemnity benefits, where the claimant has not reached MMI at 104 weeks and remains totally disabled; and 4) the costs to employers who then must again litigate the continued entitlement to such permanent disability indemnity benefits.
Furthermore, the majority opinion disregards the explicit approval by the legislative branch of our prior decisions in Osivald and Hadley. By this silence, it must be presumed that the legislature’s specific approval of our prior decisions has no relevance in the majority’s calculus of its decision to abandon settled law. Significantly, not one single judge now espouses the view that section 440.15(2), which limits temporary total disability indemnity benefits, is unconstitutional. Thus, the majority’s refusal to adhere to stare decisis violates Florida’s “strict” constitutional separation of powers.
As I discuss in Part II of this opinion, the concurring (and majority) opinion’s significant departure from stare decisis is not only unsound and devoid of support in the statutory text or legislative history, it is unnecessary. This is because the claimant here is entitled to prevail on appeal under current law, as explained in Part II of this opinion.
II. Mr. Westphal Was Entitled to Relief as a Matter of Law Based Upon the Unrefuted Expert Medical Testimony
In this case, the JCC improperly disregarded expert medical testimony, and instead relied on expert testimony that was so “equivocal, confusing, and internally contradictory and irreconcilable as [to] utterly to lack any probative value.” See Grainger, 64 So.3d at 1206 (jury may not reject uncontradicted expert medical testimony regarding permanent injury from accident, absent “some reasonable basis in the evidence. This can include conflicting medical evidence, evidence that impeaches the expert’s testimony or calls it into question....”); Simmons-Russ v. Emko, 928 So.2d 397, 398 (Fla. 1st DCA 2006) (affirming trial court’s order granting directed verdict on issue of causation based on plaintiffs insufficient expert testimony). In addition, a JCC cannot “reject unrefut-ed medical testimony without providing sufficient reason.” Jefferson v. Wayne Dalton Corp., 793 So.2d 1081, 1084 (Fla. 1st DCA 2001). Furthermore, even had the expert testimony produced a conflict, which it did not, the JCC would have been required to appoint an Expert Medical Ad-visor, whose testimony would have been presumed correct, absent clear and convincing contrary evidence. §§ 440.13(9)(c) & 440.25(4)(d), Fla. Stat.; Romero v. JB Painting & Waterproofing, Inc., 38 So.3d 836, 838 (Fla. 1st DCA 2010) (“If there is a disagreement in the opinions of health care providers, the JCC shall appoint an EMA”) (emphasis added). Here, however, there was no conflict, because the only probative expert medical testimony was presented by Dr. Hayes, the Independent Medical Examiner who established that Mr. Westphal was and would remain permanently and totally disabled.
Thus, I would reverse with directions to grant the permanent and total disability benefits for the time period at issue. The uncontroverted expert medical evidence showed that.Mr. Westphal was entitled to permanent total disability benefits under *460 the rule recently reiterated in Hadley, 78 So.3d at 624-25 (“allowing an employee whose 104 weeks of temporary benefits are about to expire to establish entitlement to PTD benefits by proving that he or she will be permanently and totally disabled after MMI”).[10]
Testifying at the merits hearing was Mr. Westphal, who was working for the City of St. Petersburg at the time of his industrial injury; Steven Cooley, a vocational expert; and John Orphanidys, who performed a reemployment assessment at the request of the City. Mr. Cooley testified: “Mr. Westphal lacks the residual functional capacity based on age, education, past relevant work, and his functional limitations ... [and] lacks the ability to perform any sedentary work existing within a 50-mile radius of his home.” Asked whether this situation was permanent or was “going to change at any point in the future,” Mr. Cooley answered: “Dr. Hayes talked about that atrophy in his leg. The nerve damage is permanent. It’s not going to go away. If anything, he’s — I believe he’s — if he gets — trying to do any type of work, he’s going to end up back with an additional surgery in the future at the adjacent level to the fusion.” Despite the JCC’s best efforts, Mr. Cooley did not waver from his opinion that Mr. Westphal’s total disability was permanent.
Several physicians testified by deposition or through “medical composites”: Dr. Hayes, the claimant’s independent medical examiner; Dr. McKalip, the authorized treating neurosurgeon; Dr. Le, the authorized pain management physician; Dr. Mixa, the authorized orthopedic physician who operated on Mr. Westphal’s leg; and Dr. Uribe, an examining neurosurgeon. In the view of the JCC, the case turned on the testimony of Dr. Hayes and Dr. McKa-lip (including implications their testimony has for the vocational experts’ assessments). While the JCC was free to conclude that Dr. McKalip was “in the best position to determine whether or not the claimant has reached physical [MMI],” that historical fact is not dispositive under the proper test, which requires the JCC to determine a claimant’s medical status when MMI is reached. See Hadley, 78 So.3d at 625-26.
Dr. Hayes, a board certified orthopedic spinal surgeon whose practice is limited to spine-related injuries, testified on behalf of Mr. Westphal. Dr. Hayes examined Mr. Westphal after the first spinal surgery Dr. McKalip performed (“L3-4 and L4-5 dis-cectomies”), but before the second surgery, a five-level spinal fusion. Dr. Hayes testified that his examination revealed atrophy in the left quadricep and upper thigh musculature (“His left leg is two inches smaller than his right leg.”). Dr. Hayes testified he “basically had to hold the patient up. He can barely stand on one leg.” Dr. Hayes described Mr. West-phal as a “fall risk,” recommended that he use his cane, and testified “[h]e’ll probably slowly lose the ability to walk.” He also testified: “I don’t think the patient can work. It would be impossible for this guy to go back to work in any capacity.”
Asked whether the L3-4 and L4-5 dis-cectomies which Dr. McKalip performed might make it possible for Mr. Westphal to return to the work force, Dr. Hayes testified that “the patient is disabled from my standpoint.... I do these type of surgeries. I don’t remember the last time I did an L2 to SI fusion on someone who [like *461 Mr. Westphal] had weakness, objective weakness and atrophy in their leg, and then they went back to work.” Dr. Hayes testified further: “The goal ... is to stop the progressive nerve damage ... so that he is not in a wheelchair in a few years ... [T]he patient is in a really bad spot, to be honest with you.... [A]trophy doesn’t get better.... All said and done, even if he had [the second operation, which Dr. McKalip in fact performed] there’s no way he is going to go back to work.” (Emphasis added.)
Dr. McKalip did not directly contradict these opinions, except that he was unwilling to say that Mr. Westphal had reached MMI even as of the (later) date on which his own deposition was taken. In describing the purpose of the second surgery, Dr. McKalip testified, “The goal of surgery was to treat his pain, and to try to restore neurologic function and strength, if possible, and to do so while respecting the scoliosis he had, and preventing him from having any further abnormal curvature to his spine.” While “hopeful he’ll never need any more surgery,” Dr. McKalip acknowledged that the extent of the spinal fusion he effected “certainly increases his risk from having adjacent level degeneration,” explaining that “I took six segments of spine that were independently moving with their own fulcrums, and made them lose all their fulcrums or their bending points, turned them into a long lever, and now he’s applying all that force at the level above the fusion at T12-L1.” Dr. McKalip also testified, “I’m very skeptical he’ll ever get his leg function back to normal ... the chances are very low that he’s going to get any return of muscle mass or function.”
Asked what Mr. Westphal’s “permanent restrictions may be” when he reaches MMI, Dr. McKalip testified:
You know, this is speculation, but it’s highly informed, and I think, you know, highly probable, that he’s going to have permanent weakness in his leg that prevents] him from, you know, applying any force to his body that, you know, can’t be supported by his weak leg.
He certainly won’t be able to do any sort of high intensity, you know, high impact job, or any work that would require him to rely on his leg, without question.
I think he will be able to do other work, sedentary work, and maybe mild activities; but he’s going to be, most probably be severely limited because of his weakness.
Dr. McKalip did not testify that, within reasonable medical probability, Mr. West-phal would ever be capable of anything more than sedentary work.
Furthermore, Dr. McKalip testified in direct contradiction of his above testimony, essentially conceding that he could not render any opinion concerning Mr. West-phal’s return to work:
Q: Would you agree that you’d be better able to determine what kind of work restrictions, what kind of functionality, at the time that he reaches MMI?
A: I will, but I have a feeling I won’t be able to do it myself. I think ultimately determining work restrictions will require either a rehab doctor to do it or a Functional Capacity Evaluation.
Q: So at this time, any work restrictions that you indicated today are just speculative, and would be better assessed at that time?
A: Yeah, or they’re educated guesses. In general, that’s correct.
(Emphasis added.) Thus, Dr. McKalip’s candid acknowledgment that he could not determine whether Mr. Westphal would be permanently and totally disabled when he *462 reaches MMI demonstrates that his testimony lacked any probative value, as it essentially was no opinion at all. As we have previously held, where a factual foundation is lacking in an expert medical opinion, “medical testimony lacks the necessary probative value to support a finding of causation.” Gold Coast Paving Co., Inc. v. Fonseca, 411 So.2d 259, 261 (Fla. 1st DCA 1982). Dr. McKalip’s testimony was, at its core, a declaration that he could not determine whether Mr. Westphal would or would not be permanently disabled when he fully healed from his surgery. Such speculation cannot support a finding of predicted non-disability any more than it can support a finding of expected disability-
In fact, none of the physicians who testified thought it possible that Mr. Westphal would ever be able to do more than sedentary work. (This was the basis on which Mr. Cooley testified — without contradiction — that Mr. Westphal was permanently and totally disabled.) Indeed, Dr. McKalip’s testimony is not clear that even he thought the possibility existed of Mr. Westphal performing more than “sedentary” work. While he did testify he thought Mr. Westphal would “be able to do other work, sedentary work, and maybe mild activities,” it is unclear what Dr. McKalip meant by “maybe mild activities” — whether he may have been contemplating non-work activities, such as recreation, or what vocational experts call “light duty” or “medium duty” work. In any event, he quite clearly said “maybe” after identifying his testimony on the whole topic as speculative to begin with. As the JCC stated, Dr. McKalip’s opinion “that permanent medical restrictions would best be determined at the time the claimant reaches maximum medical improvement,” is both self-evident and altogether beside the point because, as noted above, the ultimate conclusion which must be reached is whether the injured claimant will be permanently disabled when he reaches MMI.
While Dr. Hayes and Dr. McKalip did not agree on the date Mr. Westphal had or would reach MMI, that question is immaterial under an unbroken line of precedent. The only other disagreement between these experts was also immaterial. Dr. Hayes testified Mr. Westphal would never be able to work at all, while Dr. McKalip testified that Mr. Westphal might be able to perform sedentary work after he recovered from his five-level spinal fusion. This disagreement is immaterial, however, because uncontroverted vocational testimony established that there was no such work available to Mr. Westphal.
Where, as here, a claimant has not reached MMI, but his 104-week temporary benefit eligibility period has expired, a determination of permanent and total disability compensation benefits is not premature. We have categorically rejected the “contention that a claimant whose eligibility for temporary benefits is to expire in less than six weeks cannot establish entitlement to permanent total disability benefits by proving that permanent total disability will follow maximum medical improvement, which is expected to occur after temporary benefits must end.” Oswald, 710 So.2d at 98. See Hadley, 78 So.3d at 624-25 (“the 1994 amendments to chapter 440 ‘have given rise to a narrow but necessary exception’ to this rule allowing an employee whose 104 weeks of temporary benefits are about to expire to establish entitlement to PTD benefits by proving that he or she will be permanently and totally disabled after MMI.”) (citing Oswald, 710 So.2d at 97-98)).
Here, the JCC nevertheless ruled: “The claimant has not reached physical maximum medical improvement and, therefore, *463 a determination of permanent and total disability compensation benefits is premature.” We reversed in Hadley because the JCC awarded “PTD- benefits based on Claimant’s present disability status, rather than his status after reaching MMI as required by the statutes and case law....” Hadley, 78 So.3d at 623. Here, once again, the JCC has erroneously focused on Mr. Westphal’s “present disability status, rather than [on] his status after reaching MMI.” This was error. “The test is whether a claimant is totally disabled upon the expiration of temporary benefit eligibility, and will remain totally disabled after the date of MMI as that phrase is statutorily defined.” Crum v. Richmond, 46 So.3d 633, 636 (Fla. 1st DCA 2010). Perhaps the JCC was led to this error by the City’s arguments opposing Mr. Westphal’s motion for rehearing, in which the City stated that “the Claimant has to be at overall MMI in order to determine whether or not he’s permant(ly) total(ly)” disabled. That argument is legally incorrect.
“A claimant seeking PTD benefits before she reaches overall MMI must prove she has a present total disability and that said disability will exist after the date of MMI.” CVS Pharmacy, Inc., 51 So.3d at 517. That MMI has not been attained by the time 104 weeks has run is no bar to recovery; neither is the inability to prove the exact date when MMI will occur. The requirement is .simply to prove that total disability will be “existing after the date of maximum medical improvement.” Oswald, 710 So.2d at 98 (quoting “permanent impairment” definition found in § 440.02(19), Fla. Stat. (1994 Supp.), now codified in § 440.02(22)).
Here, the JCC could not rely on Dr. McKalip to reject Dr. Hayes’ testimony because, as the. Florida Supreme Court and our court have noted, a factfinder must have a “rational basis” to reject expert testimony. As we stated in Duelos v. Richardson:
If a jury rejects expert medical testimony that an injury -caused by an auto accident is permanent without any contrary evidence on the record, a JNOV or directed verdict is warranted. Wald v. Grainger, 64 So.3d T201 (Fla.2011); State Farm Mut. Auto. Ins. Co. v. Orr, 660 So.2d 1061 (Fla. 4th DCA 1995). Even if contrary expert evidence is presented, a directed verdict is justified ‘[w]here an expert’s testimony is so equivocal, confusing, and internally contradictory and irreconcilable as utterly to lack any probative value.’ Simmons-Russ v. Emko, 928 So.2d 397, 398 (Fla. 1st DCA 2006). On the other hand, ‘the trial court may not weigh the evidence or assess a witness’s credibility” and must deny a directed verdict “if the evidence is conflicting or if different conclusions and inferences can be drawn from it.’ Moisan v. Frank K. Kriz, Jr., M.D., P.A., 531 So.2d 398, 399 (Fla. 2d DCA 1988). If an expert opinion is sufficient to raise a fact question for the jury and the jury makes a determination supported by that expert opinion, a motion for JNOV should be denied. Hancock v. Schorr, 941 So.2d 409 (Fla. 4th DCA 2006).
113 So.3d 1001, 1004 (Fla. 1st DCA 2013) (emphasis in original); There, although our court reversed the trial court’s order granting a judgment notwithstanding the verdict, the legal principle remains controlling, that a factfinder or court cannot rely on expert testimony that is so “equivocal” as to lack probative value.
This rule limiting a factfinder’s legal authority to rejetít uncontroverted expert testimony is especially relevant in workers’ compensation proceedings, where both the legislature and this court have recognized that a JCC is not at liberty to simply *464 reject or discredit one expert’s medical testimony over another. Here, Dr. McKa-lip’s testimony did not contradict Dr. Hayes, because Dr. McKalip never testified that Mr. Westphal would not be permanently and totally disabled when he reached MMI. Rather, Dr. McKalip, in testimony that was inherently and internally inconsistent, said he might speculate that Mr. Westphal could one day perform sedentary work.
But even assuming there was a conflict in the experts’ testimonies, the JCC was not authorized to simply choose which doctor he found to be more persuasive; rather, the JCC would be legally required to appoint an Expert Medical Advisor (“EMA”) to resolve the conflict. §§ 440.13(9)(c) & 440.25(4)(d), Fla. Stat.; see Romero v. JB Painting & Waterproofing, Inc., 38 So.3d 836, 838 (Fla. 1st DCA 2010) (“If there is a disagreement in the opinions of health care providers, the JCC shall appoint an EMA.”) (emphasis added). As we recognized in Romero, a JCC must appoint an EMA where the evidence establishes a conflict between medical witnesses’ testimonies. Implicit in the requirement of appointing an EMA where a conflict exists is that a JCC has no legal authority to simply “rely on” or “choose” to disregard an expert medical opinion without a rational basis; that is, where a conflict exists, it is a doctor who must essentially decide which expert’s medical testimony is more probative, within certain parameters not relevant here.
Again, it is instructive that we have recognized that a JCC may not reject un-controverted medical testimony without “sufficient reason.” Wayne Dalton Corp., 793 So.2d at 1084. In its final order, the JCC cited insufficient reasons as a matter of law in ignoring Dr. Hayes’ uncontro-verted testimony: “While claimant urges reliance on the opinion of his independent medical examiner, Dr. Hayes, I choose to rely on the testimony of Dr. McKalip ... as being in the best position to to determine whether the claimant has reached physical maximum medical improvement.” (Emphasis added.) This is insufficient as a matter of law, because this is not the question to answer in such a case; rather, the ultimate question is whether the claimant will be permanently and totally disabled once he or she reaches MMI. CVS Pharmacy, 51 So.3d at 517. The JCC’s finding that “it is too speculative to determine whether [Mr. Westphal] will remain totally disabled after the date of [MMI]” did not rectify this error, because such a conclusion could not rationally be grounded on Dr. McKalip’s testimony.
Furthermore, where an expert medical witness testifies unequivocally that a claimant will be permanently and totally disabled after reaching MMI, another expert medical witness’s speculation and equivocation cannot prevail against the testimony of the witness who actually possesses an opinion. Grainger, 64 So.3d at 1205. Factual findings cannot be based on inherently and internally contradictory evidence or speculation under the Florida Supreme Court’s decision in Grainger.
Conclusion
Because the majority opinion enacts substantive law in violation of Florida’s strict separation of powers and unnecessarily departs from stare decisis, I cannot join in the majority opinion. In my view, this court should hold that Mr. Westphal is entitled to relief, as he established he was and will remain totally disabled at the expiration of the temporary total disability benefits, under section 440.15(2), Florida Statutes. This court should adhere to its precedent, grant relief, and comply with the limitations on our authority established *465 in the superior organic law in article II, section three of the Florida Constitution.

. In the 1993 Workers' Compensation Reform Act, which eliminated all temporary total indemnity benefits after 104 weeks, in addition to eliminating wage-loss benefits, the Legislature expressed its intent and findings in unambiguous terms: "WHEREAS, permanent total disability benefits are awarded in Florida at levels more than five times the national average, and ... WHEREAS, the Legislature finds that the wage loss formula is partly to blame for an increase in eligibility for permanent partial disability benefits and for an increase in total payments for permanent partial disabilities^]” and concluded that "the reforms contained in this act are the only alternative available that will meet the public necessity of maintaining a workers' compensation system that provides adequate coverage to injured workers at a cost that is affordable to employers....” Ch. 93-415, Laws of Fla. (emphasis added).

. The consequences of the majority opinion’s new version of the statute may be adverse to both employers and employees. As to employers and carriers, the Florida Office of Insurance Regulation recently received an application by the National Council on Compensation Insurance to increase workers' compensation insurance rates. If approved, rates will have increased for the fourth consecutive year. See “Office Statement on Annual National Council on Compensation Insurance Workers' Compensation Rate Filing, Friday, August 16th, 2013, http://www.floir.com/Press Releases/viewmediarelease.aspx?id=2018. While this Office Statement notes that the rates are almost 55.9% lower than a decade ago, the majority opinion’s new version of the statute, which dramatically increases eligibility for permanent total disability benefits, could lead to an increase in future rates. And in 1993, when the limitation of temporary disability indemnity benefits was changed from 260 weeks to 104 weeks, one Florida Senate analysis estimated that the change would save one percent of "system costs,” or "$32,742,583” in 1993 dollars. See Senate Staff Analysis and Economic Impact Statement, Senate Bill 12-C, October 29, 1993, Section 18, pg. 37. By granting an even greater entitlement to permanent disability indemnity benefits, the majority opinion could impose far greater costs in 2013 dollars.
By contrast, regarding employees, the opinion may provide an economic incentive to employers to more vigorously litigate entitlement to temporary disability indemnity benefits. This is because once temporary disability benefits are conceded, when such benefits expire, today’s opinion "deems” that the totally disabled claimant has reached maximum medical improvement, and the employer will be required to pay permanent disability benefits for the indefinite future, as a matter of law. Although the majority opinion notes that current law allows employers and carriers to revisit these permanent benefits, that remedy imposes costs itself. Of course, it is the Legislature which is the most appropriate branch to study and consider these potential consequences, which is why the organic law assigns that body the preeminent power to enact public policy. Fla. House of Representatives v. Crist, 999 So.2d at 611-12.

. The Texas statute also extends a decision on maximum medical improvement "if the employee has had spinal surgery, or has been approved for spinal surgery ... within 12 weeks before the expiration of the 104-week period.” The Texas statute provides that "the order shall extend the statutory period for maximum medical improvement to a date certain, based on medical evidence presented to the commissioner.” Tex. Labor Code § 408.104, referencing Tex. Labor Code § 401.11(3 0)(b) (emphasis added). This Texas statutory provision is further evidence that the questions involved in such determinations, such as what types of injuries require longer periods for determining maximum medical improvement, are quintessentially issues of public policy involving medical classifications. In Florida, such fundamental policy issues must be resolved by the legislature, not the judiciary. Fla. House of Representatives v. Crist, 999 So.2d at 611.

. See East v. CVS Pharmacy, Inc., 51 So.3d 516, 517 (Fla. 1st DCA 2010) ("A claimant seeking PTD benefits before she reaches overall MMI must prove she has a present total disability and that said disability will exist after the date of MMI.”); Crum v. Richmond, 46 So.3d 633 (Fla. 1st DCA 2010) ("We explained in City of Pensacola Firefighters v. Oswald, 710 So.2d 95 (Fla. 1st DCA 1998), that a claimant who has exhausted entitlement to temporary disability benefits, but who has not yet reached MMI, may receive PTD benefits when he or she can prove present total disability and total disability existing after the date of MMI.”); Fla. Transport 1982, Inc. v. Quintana, 1 So.3d 388 (Fla. 1st DCA 2009) ("[I]f a claimant is not at overall MMI after receiving 104 weeks of temporary benefits, the claimant may nevertheless establish entitlement to PTD benefits by proving total disability due to an impairment ‘existing after the date of [MMI],'.... In other words, a claimant can still prove entitlement to PTD before reaching overall MMI, if the claimant can prove he is PTD from one of his injuries standing alone.”) (emphasis added; citation omitted)); Olmo v. Rehabcare Starmed/SRS, 930 So.2d 789, 794 (Fla. 1st DCA 2006) (claimant was not required to assert entitlement to PTD benefits under Oswald until and unless "she is in a position to 'show not only total disability upon the cessation of temporary benefits but also that total disability [would] be ‘existing after the date of maximum medical improvement.’ ”) (quoting Oswald, 710 So.2d at 98); Rivendell of Ft. Walton v. Petway, 833 So.2d 292 (Fla. 1st DCA 2002) ("Given the unrefuted medical evidence indicating a reasonable likelihood of psychiatric improvement if Claimant receives psychiatric treatment and care, and the record evidence showing that Employer/Carrier authorized and provided a psychiatrist, we conclude that Claimant failed to meet her burden, as established in Oswald and Emanuel [v. David Piercy Plumbing, 765 So.2d 761 (Fla. 1st DCA 2000)], to show that she has reached psychiatric MMI.”) (first emphasis added, second in original); Metro. Title & Guar. Co. v. Muniz, 806 So.2d 637 (Fla. 1st DCA 2002) ("On remand, the claimant may present evidence that he has reached maximum medical improvement ... [but] if that is not the case, and if temporary benefits have expired, the claimant may obtain an impairment rating and seek permanent total disability benefits based on a future date of maximum medical improvements under the procedure in Oswald.”) (emphasis added); McDevitt Street Bovis v. Rogers, 770 So.2d 180 (Fla. 1st DCA 2000) ("nobody testified either that the claimant had reached maximum medical (psychiatric) improvement or that she would remain permanently and totally disabled when she did reach maximum medical improvement,” thus, PTD claim should have been denied) (emphasis added); Daws Mfg. Co., Inc. v. Ostoyic, 756 So.2d 175, 176 (Fla. 1st DCA 2000) (noting that JCC did not have benefit of Oswald "where we explained that to establish entitlement to permanent total disability indemnity benefits under the revised version of chapter 440 which went into effect on January 1, 1994, a claimant must prove total disability on account of impairment existing after the date of maximum medical improvement [and] Ostoyic has conceded that the record on appeal does not establish ... under the exception to the ‘venerable rule’ that permanent disability benefits are premature if claimant is not yet at MMI.” (emphasis added).

. We further note that the City acknowledged at oral argument its agreement that Mr. Westphal was permanently and totally disabled within less than one year after the JCC denied his claim. This is consistent with Dr. Hayes' testimony that Mr. Westphal was and would remain permanently and totally disabled.